ANNIE JAFFI v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

Division Two, July 1, 1907.

1. **VERDICT: Against Physical Facts.** Where two witnesses positively testify that, after the wheel of the car ran over the little boy's foot on the rail, his foot somehow became entangled in the wheel or a portion of the car and he was dragged in that way for some distance while one of them held him up and tried to extricate him, the court will not hold their testimony incredible and declare the verdict against the conceded physical facts and contrary to reason, especially where one of them, a foreigner, says there were many things on the car there but she could not tell what they were, and none of defendant's witnesses testify that there were no brakeshoes, rods, chains or other contrivances about the brake or wheel in which the boy's foot could have been caught.

2. ————: ————: **Negligence: Kicking Dead Cars: No Watchman.** Where there was sufficient evidence to sustain the material facts in the case, namely, that cars were left standing on the track in the street in a densely populated part of the city, and were kicked back without any notice or signal of any kind and without any brakeman or other person being at the rear end of the cars before they were placed in motion, and that when moved under such circumstances the little boy's foot was caught at the rear end of the rear car and he was dragged under the car and killed, the court will not hold that the case should not have been submitted to the jury on the ground that the testimony for plaintiff was so radically opposed to the physical facts that it cannot be made the basis of a verdict.

3. **INSTRUCTIONS: Assumption of Fact: Negligence.** An instruction which begins with, "If the jury find  from the evidence," and then proceeds to submit the facts which the jury must find before they can find for plaintiff, and says in reference to the running of the car which caused the injury "and that the running and management of its cars as aforesaid, if they were so run and managed," etc., does not assume the existence of the facts stated, but does leave them to be found by the jury.

4. ————: **Too Long.** It is improper to send the jury to the pleadings to find the issues submitted to them, and an instruction which embodied the substantive facts which plaintiff was required to establish, those facts all being put in issue by defendant's answer, is not too long.

5. ———: **Misunderstanding of Issues: Going Between Cars.** Where plaintiff's case is based on defendant's negligence in kicking back "dead" cars located on its track in a public street, in the midst of a dense population, without having a brakeman or other person present to warn children or other persons about to cross near the rear end of the "dead" cars, and thereby as plaintiff's little son was on the track or about to cross, the cars, without any notice or warning, were kicked back over him, an instruction which specifically called the jury's attention to defendant's duty to have someone at the rear end of the "dead" cars to warn persons who might be in danger, when fortified by another for plaintiff which told the jury defendant "was not required to guard against persons under or between its cars" and by one for defendant which told them that plaintiff could not recover if the boy attempted to pass between or under the cars, is not liable to be understood as telling the jury that it was defendant's duty to have some one present to warn persons not to pass between or go under the cars.

6. ———: **Contributory Negligence: Little Boy.** Defendant cannot complain that the court submitted the question of the contributory negligence of the six-year-old boy injured, for if error, it was in its favor.

7. **NEGLIGENCE: Right to Street.** A child six years old has the same right to the use of a public street that the defendant railroad company whose tracks are located therein has.

8. **REMARKS OF COUNSEL: How Preserved.** Remarks of respondent's counsel in arguing a case to the jury, if not preserved in the bill of exceptions, are not before the appellate court for review.

9. **CONFLICT OF EVIDENCE.** Where there is an irreconcilable conflict in the evidence, and the jury resolved it in favor of the plaintiff, and her evidence was not such as would authorize the appellate court to say it was opposed to all physical laws and utterly unworthy of belief, and no error appears in the instructions or rulings of the trial court, the judgment will be affirmed.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover,* Judge.

AFFIRMED.

*Elijah Robinson* for appellant.

(1) Under the undisputed evidence plaintiff was not entitled to recover, and the court should have directed a verdict for defendant. 1. Plaintiff's theory of the case is disproved by the conceded physical facts; and the verdict is contrary to reason and ought not to be permitted to stand. Hayden v. Railroad, 124 Mo. 566; Kelsey v. Railroad, 129 Mo. 362; Nugent v. Milling Co., 131 Mo. 258; Lane v. Railroad, 132 Mo. 4; Huggart v. Railroad, 134 Mo. 680; Payne v. Railroad, 136 Mo. 583; Oglesby v. Railroad, 150 Mo. 188; Hook v. Railroad, 162 Mo. 598; Petty v. Railroad, 179 Mo. 687; O'Keef v. Railroad, 81 Mo. App. 386; Covell v. Railroad, 82 Mo. App. 180; Spohn v. Railroad, 87 Mo. 74; State v. Fannon, 158 Mo. 149; Spiro v. Railroad, 102 Mo. App. 250. 2. This verdict is against every reasonable probability that might result from the evidence, and the inevitable conclusion must be that it was the result of partiality or prejudice on the part of the jurors, and a judgment based on such a verdict should be reversed. Jeans v. Morrison, 99 Mo. App. 208; Gage v. Trawick, 94 Mo. App. 307; Cook v. Railroad, 94 Mo. App. 417; Baker v. Stonebraker, 36 Mo. 345; Price v. Evans, 49 Mo. 396; Bautrain v. Railroad, 78 Mo. 44; Rosecrans v. Railroad, 83 Mo. 678; Spohn v. Railroad, 87 Mo. 74; Cannon v. Moore, 17 Mo. App. 92; Whitsett v. Ranson, 79 Mo. 258; Freiz v. Fallon, 24 Mo. App. 439; Empey v. Railroad, 45 Mo. App. 422; Walton v. Railroad, 49 Mo. App. 620; Glick v. Railroad, 57 Mo. App. 97. (2) The trial court committed error in giving plaintiff's instruction 5. Said instruction, considering the language thereof, was calculated to mislead the jury. The plaintiff's son did not have the same right to use the street that defendant had. Defendant had procured the right to lay its tracks in said street, and had the right to run its cars over those tracks, exercising, of course, reasonable care in doing so. Outside

of its tracks defendant had no right to occupy said street, but upon its tracks in said street it had a right superior to that of plaintiff's child, or any one else. The giving of said instruction, being calculated to mislead the jury, constituted prejudicial error.

*Gage, Ladd & Small* and *Sharp & Sharp* for respondent.

(1) Plaintiff distinctly testifies that the boy's foot or shoe was caught, and that the boy was dragged, and that she followed him until the cars stopped, holding the boy and trying to extricate him, but was unable to do so. She saw many things at the rear of the car, but could not tell what they were, and could not tell just how the boy's foot was caught and held. This was certainly positive testimony that there was something in the rear of that car, near the wheels, which caught and held the boy's foot. Hessie Ray testified to the same thing. Mrs. Keating testified that when she first saw Mrs. Jaffi she was stooping down at the rear of the north car, over her boy. So did the policeman, Corrigan. Thus there was abundant evidence produced by plaintiff that there was something at the end of the car which caught the boy and dragged him south. And the absence of testimony and the suppression of testimony by defendant on this point also corroborates these witnesses and plaintiff. No witnesses for defendant — none of the railroad men who operated this car— testified that there was nothing at the end of the car in which the little boy's foot could be caught, in the great struggle for life he must have made while his mother was trying to rescue him from death. It was immaterial how the boy's foot was caught. The question was, was it caught? The cases cited by appellant are the very reverse of the case at bar. (2) The verdict is not against the weight of the evidence. As shown by the record, the verdict appealed from is the second verdict

for plaintiff in this case. The first verdict was set aside by the lower court as against the weight of the evidence. The lower court, therefore, did not err in refusing to set aside the verdict appealed from, for that reason: 1st. Because under section 801, Revised Statutes 1899, a verdict cannot be set aside a second time for the reason that it is against the weight of the evidence. McFarland v. U. S. Assn., 124 Mo. 204. 2nd. Because the preponderance of the credible testimony was in favor of plaintiff. (3) Plaintiff's instruction 5 is complained of because it told the jury that plaintiff's child "had the same right" to use the highway that defendant had. This statement in the instruction is the law, and in no way misled the jury in the connection in which it is used. Jennings v. Railroad, 112 Mo. 268; Kennayde v. Railroad, 45 Mo. 255; Scullin v. Railroad, 184 Mo. 695; Rapp v. Railroad, 190 Mo. 161; Riska v. Railroad, 180 Mo. 168.

GANTT, J.—This is an appeal from the circuit court of Jackson county. The action was commenced on the twenty-second of June, 1901, and afterwards an amended petition was filed on December 17, 1901.

Plaintiff states that on the thirteenth of May, 1901, she was the mother of Harry Jaffi, a minor son six years of age, and that the father of said minor was dead, and that the said Harry Jaffi was never married; that on the thirteenth day of May, 1901, about 3:30 p. m., a train crew of the defendant company, consisting of Dick Addison and William Reed, engineer and fireman, and Lon Hayden and W. J. Thelan and Pone Whiting as brakemen, were operating an engine and string of cars on State Line street, a part of which is in the State of Missouri and in Jackson county. That said State Line street is a public street located in a densely populated portion of Kansas City, with tenement houses located on each side thereof, which were

occupied by a large number of people, and many children were constantly on the street. That the engine attached to said train was on the south end thereof; that said train was backed north on said central main line track, toward Central avenue; that when the north end of said train reached the vicinity of Central avenue and so that the north end of said train was about directly west and opposite the Jaffi house, the three cars farthest north were cut off and left standing on the central main line track of said State Line. That said train was then pulled about two hundred feet south and kicked some cars in onto one of the hay tracks, which is situated on the west side of the said main line track, and then said crew kicked a second bunch of three cars northward on said central main line track to and within a few feet of the first two of the three cars first kicked north as first described; that said crew then pulled a bunch of about five cars out from one of the hay tracks to the south, and onto the said central main line track, and then backed them northward against the second three standing farther south on said central main line track, and coupled onto them; that said crew then violently, negligently and suddenly backed said train northward against the first two or three cars standing farthest north on said main line track, which were then standing with the north end thereof northwest and opposite the plaintiff's house, without sounding any alarm or giving any warning that said two or three cars standing farthest north were about to be bumped against and pushed northward, and without having any brakeman, watchman or other person on the north end of said north cars, or in a position to warn persons in danger of being run over. That while said north three cars were standing still and immediately prior to their being pushed northward, the said Harry Jaffi, the minor son of the plaintiff, attempted to cross said central main line track from the west

toward the east and within a few feet of the north end of said north three cars, and while said minor was still in the State of Missouri, and atempting to cross said track, he was struck by the north end of said three cars, crushing and mangling his foot until the same became entangled in a portion of said cars, and that the agents and servants of the defendant then having all the cars on said main line track coupled together, suddenly started the entire train south, thereby dragging the body of said minor toward the south a distance of about one hundred and twenty-five to one hundred and fifty feet, when said train stopped and again backed toward the north, thereby running over the legs and body of said minor, killing him almost instantly; that the death of said minor was caused by the negligence of said defendant company in this, to-wit: First. That said defendant company and its duly authorized and acting servants and agents were guilty of negligence in that it pushed said three north cars northward, which caused the death of said minor, without having any watchman or brakeman upon the north end of said three north cars, or without having a brakeman, watchman or any person in a position to warn persons that were in a position of danger of the movement of said three north cars. Second. That said defendant company and its duly authorized and acting agents pushed said three north cars northward along said State Line street, without ringing any bell, blowing any whistle, or sounding any alarm whatever to indicate that said three north cars were about to be bumped and pushed toward the north, so that persons in places of danger might protect themselves. That said Harry Jaffi died from the injury received and occasioned by the negligence and unskillfulness of the officers, agents, servants and employees of said defendant company, while running and managing the said cars as aforesaid, and that by reason thereof, plaintiff has been deprived of the

society, comfort, enjoyment and earnings of her said son, to the plaintiff's damage in the sum of five thousand dollars, for which she prays judgment and cost.

. To this petition, the defendant in its answer admitted that it was a corporation engaged in the operation of the line of railway described in the petition, and that on the day and at or near the place stated, an accident occurred whereby Harry Jaffi, the minor son of the plaintiff, was killed, but denied that his death was caused by any carelessness or negligence on its part or that of its servants, agents or employees, and then made a general denial of all the other allegations in the petition, and for a further answer a plea of contributory negligence on the part of said Harry Jaffi and of the plaintiff his mother.

The cause was tried and resulted in a verdict for the plaintiff, which upon a motion for a new trial was set aside by the court on the ground that the verdict was against the weight of the evidence. The cause was then retried at the November term, 1903, and again resulted in a judgment for the plaintiff for five thousand dollars. From that judgment the defendant appeals.

There is irreconcilable conflict in the testimony of the various witnesses, but the evidence on both sides established that the plaintiff's son, a boy about six years old, was killed by being run over by defendant's cars on State Line street in Kansas City, Missouri, on the thirteenth of May, 1901. State Line street runs north and south between the States of Kansas and Missouri, and is divided by the State line and is located in what is known locally as the "west bottoms" in Kansas City and at the time of the accident it was occupied by the tracks of the Missouri Pacific Railway company, the defendant herein, and according to the evidence, was used as a yard for the making up of trains. The main track of the railroad is in this State, and some of the

switches are on the Missouri side and some on the Kansas side of the line. On the Missouri side the street is thickly settled, and Mrs. Jaffi resided in the house on the east side of this street, into which she had moved the day before, the said house being two hundred and fifteen feet south of the corner of State Line and Ninth streets. On the afternoon of May 13, 1901, a crew of the defendant company consisting of the engineer, a fireman and three brakemen, were engaged in switching freight cars on the defendant's tracks in said State Line street to and from a hay house located west thereof. A short time before the accident occurred in which Harry Jaffi was killed, this crew had placed six cars, consisting of two strings of three cars each, on the main track in said State Line street, the north end of the north three cars being a short distance south of a point directly opposite the house in which Mrs. Jaffi resided and the north end of the other three cars was about a car length, more or less, south of the south end of the north three cars. It appears that after the crew had done some switching on the hay tracks, they ran the engine with five cars attached thereto, on to the main track south of the two strings of cars, which had been left, as above described, on the main track in the street, and the engine, which was south of all these cars and headed north, pushed these five cars north and coupled on to the south string of three cars. At this point, the evidence is directly contradictory. On the part of the plaintiff, Mrs. Jaffi testified that she had just given the little boy a cup of water, and he complained that it was dusty or muddy, and went out into the street to throw it out. He was gone only a few minutes when she heard the noise of the train, and she stepped out to look after him; she saw the cars were backing and she ran to him, and as she ran she saw the car hit him on his right leg and stop, she ran to him and caught him up, but his foot was caught

in some way, and the train started forward to the south, and she followed holding the boy up trying to disengage him. The train again stopped and bumped backwards, throwing her down and the child under the wheels. The plaintiff was a foreigner and her account of the striking of the little boy and the catching of his foot in the brakes, was very broken and somewhat difficult to understand, but from her statement, it can be gleaned that the child was struck by the west wheel at the north end of the northernmost car of the train; that she ran to him and caught him by the shoulders and tried to pull him loose from the wheel, but could not do so, and he was dragged a distance of 125 feet or more, and when the cars stopped they suddenly backed north again and ran over the boy and also knocked her down.

Mrs. Keating, the witness for the plaintiff, who lived in the second story of the same house with Mrs. Jaffi, testified that at the time of the accident she heard some screams and ran to the front yard, caught up Mrs. Jaffi's crippled child that was crying and calling for its mother, and ran out on the sidewalk and looked south but could see no one; the child was still crying in her arms, and she thought that perhaps the screams came from the cottage north of the house where she lived. She ran up the street and found that the screams did not come from that point. She then ran out into the street around the north end of the cars standing in front of the buggy house and came down on the west side. There she discovered Mrs. Jaffi crouched down at the rear wheel of the north car. The witness then ran with the crippled child and left it with another child and ran back to Mrs. Jaffi, and found her bending over the boy Harry, who had been crushed and injured, and she took hold of her, Mrs. Jaffi, and undertook to force her back to her own gate and with the aid of some other women did so, but at the gate Mrs. Jaffi broke

loose and ran back to the wounded child. She then went
to a policeman and afterwards went back to the scene
of the accident; when she got there, the cars had been
pushed back a little north of where they were when
she went to Mrs. Jaffi. He was taken out from under
the train right close to the frog in the track. Cross-
examined on this point as to the moving of the car, she
gave her reasons for saying it had backed up while she
was gone, that when she went back she did not have to
go so far south as she did the first time. They had not
been moved very far, but she said she paid very little
attention to the exact distance as she had gone there to
help Mrs. Jaffi.

Another witness, Hessie Ray, testified she lived at
934 State Line street, and remembered the accident
which happened to the little Jaffi boy; it was about
three o'clock in the evening; her house was on the west
side of the street towards the south. She was washing
that day, and had come over on the east side of Ninth
street where she got water; when she went after the
water she did not notice whether there was any car in
the street or not. She got the water and started home,
coming from the north going south, and when she was
on State Line street on the north end of the cars, she
saw the little boy throw out his water and the train
backed on him. He had started back and got his foot
on the track and the train backed and caught him
pretty near in front of Mrs. Jaffi's house. The car was
standing still when the boy started to cross the track,
she did not notice exactly where he was caught, she was
scared herself. After the car caught the boy, it pulled
south quite a ways and then bumped back and then
stopped, and if they had not jerked the boy out as
quick as they did it would have cut him in two. His
mother had hold of his arms and was hallooing. His
mother held on to him until the train knocked her down
and then another white woman ran up and dragged her

and pulled her away and then a man pulled the child out from under the cars. She was asked, who reached the boy first after the accident besides his mother, and she answered this white woman, and then the colored boy ran in and jerked the child out. The white woman was Mrs. Keating. After Mrs. Keating took Mrs. Jaffi away, she saw the cars move twice. Just how the boy was caught she could not say, but he was caught in some manner near the rear wheel of the car. She also testified that there were two or three cars standing still further north in front of the buggy house on a switch.

Thomas Corrigan testified that he was police officer in Kansas City working on west Ninth street, at the time of the accident, and was on Ninth street, east, at the corner of State Line street, when a man told him that a boy had been run over; that he came down to the southeast corner of State Line and Ninth streets, which he thought was about two hundred and seventy-five feet from the place of the accident; that from this point he could see the mother leaning over the child and there was no one else at the end of the car or in sight at that vicinity; that he went straight from the corner down to where the little boy was, right down the street the nearest way; that there he saw blood on the frog on the rail right at the frog; that when he got there Mrs. Keating was there and some colored people, and the foreman of the train crew came up to ask him where he could find a telephone; that he saw Mrs. Keating have hold of Mrs. Jaffi, wanting to take her to the house, and she took her away from the child, but that she had not taken her away when he left with the foreman. This evidence tended to show that the accident occurred at the north end of the north car, as the policeman, Mr. Corrigan, could not have seen Mrs. Jaffi from the southeast corner of Ninth street if she had been at the south end of the car and on the west side of it.

The defendant's evidence tended to prove that the

boy was struck by the north wheel of the second car from the north on the west side, and that he was pulled out from under those wheels by a negro man named Pope, who testified for the defendant in the case, and that the cars stopped immediately after running over the boy's leg and foot and were not moved again for a good while and not until after the child had been taken away by a police ambulance. The testimony of Pope directly contradicted the plaintiff's testimony in the case. Nearly all the witnesses for the defendant testify to the finding of the child right at that point between the first and second cars, and to the fact that the cars were not moved at all from the time the child was knocked down until he was taken away by the police ambulance. They also testified that there were drops of blood on the south wheel of the north car, which was north of the place where the boy was run over, according to their testimony.

It was admitted by counsel for the defendant in open court that there was no brakeman on the top of the cars, nor was there any brakeman at the north end at the time the boy was injured, but that a brakeman was at the south end of the three stationary cars there.

W. J. Thelan testified for the defendant that he was one of the switchmen handling these cars; that the engine pushing the different cars came up the track from the south to the first three cars standing there, and the foreman Hildebrand made a coupling; that the engine and the eight cars then came on north until they struck the last three cars, when he himself coupled them; that the engine then pulled those cars back to the south until they were clear of what is called the hay switch, when the witness started to cut these three cars off and did pull the pin between them and the other cars; that just as he was pulling the pin, the cars at that time moving southwards, he heard Pope hollow, "Do not move these cars, you are running over some-

thing." That he had already given the signal to the
engineer to stop the cars and that they were never
moved after that at all until the boy was taken to the
house. This witness says that when he heard Pope
halloo, he jumped through the train and saw him pull-
ing the child out at the rear of the second car; that he
then jumped back immediately and gave the emergency
signal and then told Hildebrand what had happened
and then went south to talk to the engineer and tell
him. He was asked, "Did you notice any blood on the
rail? A. I noticed blood on the rail, yes, sir. Q.
Where was the blood with reference to the south wheel
of the north car? A. It was south of it. Q. Did you
notice blood on any of the wheels? A. Yes, sir, on the
top of the south wheel of the north car." This witness
also testified that just before the accident, he went by
the north end of these three cars and saw no one. On
rebuttal it was shown that on two previous trials he
had not so testified and the counsel for the defendant
had previously admitted that no one was near the north
end or on top of the car.

Hildebrand, the foreman of this switching crew,
was called by the plaintiff and testified that when he
found the little boy they had pulled him out from be-
tween the north car and the car next to it on the south.
"Q. He was between the south end of the north car
and the north end of the south car? Ans. Yes, sir.
Q. Did you notice any blood there? Ans. Yes, sir.
Q. Where was the blood? Ans. There was blood on
the rail right between the two cars and blood on the
top of the wheels, on the south tire of wheels on the
north car." He testified further that before coupling
on to the north three cars he did not send any one of
his crew back to the end of these north cars to see if
everything was clear behind them in the street, but
that it was a man's place to see that it was clear. He
did not see any one go back there; that he paid no at-

tention to it. The counsel for the defendant objected
to this last testimony on the ground that it was im-
material and it had been admitted that there was no-
body back there at the time, that there was nobody on
the top of the cars and nobody nearer than Mr. The-
lan, who was three cars length from the north end of
the cars.

John Davis testified for the defendant that he was
sitting on the east side of the street when the accident
occurred; that he heard the child scream; that he look-
ed under the cars and there was a boy lying there, and
he saw a fellow take and jerk him and pull him out in
a westerly direction; that he jumped over the bump-
ers between the north car and the car next to it, and
saw Tom Corrigan the policeman standing there, and
that Mrs. Jaffi came down there hollowing, ''Oh my
child, my boy'' and then others came.

George Fleming for the defendant testified that
he was sitting on the sidewalk on the street and heard
the child scream; that he looked under the box car
just as the wheels stopped rolling, and saw him on
the track between the north car and the south car, un-
der the north tracks of the south car when he first
saw him as he ran around the north end of the north
car, and when he got around there Pope was pulling
him out from under the car. He then went for a police-
man, Thomas Corrigan; that he did not go back with
him to the boy.

William Pope testified that he was the man who
saw the boy run in between the north trucks of the sec-
ond car and that the boy was knocked down and the wit-
ness pulled him out. That witness was within two or
three feet of the boy at the time he ran in. His state-
ment of it is that the accident occurred when the en-
gine backed back and they had some more boxes on
the south end. They backed back and bumped against
these three boxes that were standing still and knocked

the boy down. The train pulled up when they ran over his legs, and I grabbed him and pulled him out. He testified that Mrs. Jaffi was not there at all until two or three minutes after he had pulled the child out; that there was a crowd there when she got there.

John T. Moore testified for the defendant that he was sitting on the sidewalk on the east side of the State Line street; that he heard a child scream; looking in the direction of the train, he saw under the trucks the form of a man or a child and heard a man's voice say, "Stop the cars, you are running over a boy;" that he went up around the north end of these cars, down on the west side to the junction between the first and second cars, and the boy was at the north end of the south car, the one that was connected with the north car; that the north car did not touch the boy at all, it was the north end of the south car, it was between the trucks that ran over him; that William Pope was the only one there; that after they had taken the boy out, Mrs. Jaffi first came upon the scene.

Lon Hayden testified that he was one of the switch gang operating these cars at the time of the accident; that the engine with five cars was pushed up and coupled on to the second three cars, and then they were pushed up and coupled on to the north three cars; that when the coupling was made, the train moved very slowly and easy so that they did not jar the stationary cars or move them to amount to anything. After the north three cars had been coupled on, I heard some one halloo and ran up the track and saw a colored boy or man named William Pope pulling this boy from under the south end of the north car. I ran up there and by the time I got there, there were two or three colored boys there, they reached there before I did. There was no one else there at the time. Soon after I got there the little boy's mother and another woman came.

205 Sup—30

I noticed blood on the rail opposite to where Pope had the boy and also blood on the top of the south wheel of the north car. The cars were not moved from the time I first heard some one halloo until the little boy was taken away.

Reed, the fireman, testified that he was starting to push the cars up to couple on to the other cars standing on State Line street, and the engineer stopped so suddenly he asked what was the matter, and the engineer said that from the signal someone was hurt. He went up to where the boy was lying and saw blood on the rail and on the south wheel of the north car.

Addison, the engineer, testified that he was in charge of the engine when the boy was hurt; that the cars had all been coupled together, and he then got the signal to pull back slow; that he did so, but could not. say just how far; that he was looking back to see where the crew were and watching them because he knew that they would give him a signal to stop and directly he got the signal, he put on the air and stopped suddenly.

I. The chief contention of the learned counsel for the defendant is that the verdict in this case is against the conceded physical facts and is contrary to reason. There are numerous decisions of this court holding that where such is the case this court will reverse a judgment on that ground. There are many such cases and it is not at all necessary to make a list of them; the important matter is to determine whether this assignment of error is well founded. The petition alleged that the little boy was attempting to cross the said railroad track just north of the said stationary cars, and that these cars without any warning or notice whatever and without having any watchman or brakeman upon the north end thereof or any watchman or person in position to warn persons who were in the position of danger from the movement of the said cars,

were violently and suddenly backed northward and struck the child and then were moved southward and dragged the body of the little boy whereby he was mangled and killed. Mrs. Jaffi, the mother, distinctly testified that the train was thus backed over the little boy and that his foot or shoe was caught in some way and he was dragged south, and that she ran to him and attempted to extricate him but was unable to do so. The negro woman, Hessie Ray, corroborated Mrs. Jaffi's testimony, and Mrs. Keating testified that when she first saw Mrs. Jaffi she was stooping down at the rear of the north car over her boy, and Mr. Corrigan, the policeman, testified to seeing them at that point. But it is earnestly insisted by the counsel for the defendant that this story of the mother and these witnesses is absolutely unreasonable and incredible, first, because there was no evidence of any injury on his head or no evidence of a blow on his head, and as the boy was taller than the bottom of the car, this necessarily would have appeared. But the main proposition as we gather it upon which this court is asked to reject this testimony as utterly incredible, is that there was nothing about the wheel of the car or in any way connected with the wheel or the other appliances that could have taken hold of the boy's leg or foot and dragged him any distance. But this contention of counsel ignores the testimony of Mrs. Jaffi who said there were many things at the rear of the car, but she could not tell what they were, nor just how the boy's foot was caught and held, and it is a significant fact that none of the witnesses for the defendant who were in charge of that train testified that there was nothing at the end of the car in the shape of brake shoes, rods, chains or other contrivances connected with the brake in which the boy's feet could be caught, and the sketch of the car made by the witness, Mr. Gableman, is confessedly not of the particular car which ran over the little boy, but

simply an ordinary freight car that was standing on the track at the time he made the measurements of the street. Moreover, the exhibit only shows the outline of the car, and the distance from the top of the brake to the top of the rail and from the top of the rail to the bottom of the car, and the distance between the wheels. On cross-examination, Mr. Gableman stated that his diagram did not purport to represent the car that ran on the boy, and that his diagram did not show the crossbars or other contrivances connected with the brake. He did not make a picture of the rear end of the car so as to show the rods, crossbars and chains and shoes and other things connected with the brake, but simply a general outline of the car. That he was not instructed to show all of these things. He testified further that the distance from the Jaffi house to the east rail of the railroad track was twenty-three feet and three inches and that the west rail would be practically five feet more or twenty-eight feet and three inches. Counsel for the defendant insists that our common knowledge alone would teach us that if the wheel of the car when bumped northward ran over the child's foot on the rail and then started again southward, the wheel would have rolled off of his foot and left him in that position, but in the absence of all knowledge as to what the contrivances were at the end of that car, and of what they consisted, and confronted with the positive evidence of two witnesses whom the jury must have believed and credited in order to have found the verdict for the plaintiff, we are not prepared to say that it was impossible for the boy to have been caught and dragged, nor is it strange that the mother under the circumstances, even if she could have spoken English intelligently, could not tell just how the little boy was caught; to her the horrifying fact was that he was caught, and it is not to be wondered that she could not definitely describe what it was that held him. But

counsel say that if her evidence was true that there was something about the appliances that caught the boy's shoe or stocking, the efforts of the mother would have been sufficient to have extricated him. We do not think this is at all self-evident. How much strength or how much judgment she exhibited in attempting to pull the child out as the car moved and she followed, we can only tell from her testimony and the evidence of the other witnesses who saw it and who said the mother herself was knocked down by the sudden backing of the train. Two juries have concurred in finding that the boy's foot was caught and that he was dragged as testified to by the witnesses and the learned circuit court judge who heard this case on the last trial has given it his approval. In our opinion, the case is widely variant from the class of cases in which this court has held that certain physical facts disproved and controverted the oral testimony of witnesses, and that those cases are not applicable here. Discrepancies are also pointed out under this head by the learned counsel for the defendant, discrepancies which were fair and just matters of comment and argument before the jury, but these were matters for the jury to settle. That these women became excited and may have got some of the facts mixed, or may not be able to explain each occurrence in its natural order and sequence, in view of the affecting spectacle of this little child being crushed, is not at all strange.

As to the material fact, to-wit, that the car was kicked back in the public highway without any notice or signal of any kind and without any brakeman or other person being at this north end before this car was placed in motion on the street in front of a densely populated district, and that the boy's foot was caught and that he was dragged under the car, there was sufficient evidence on which to submit the case to the jury. Indeed, as to the negligent act of kicking these cars

back on a public street without any warning of any kind
and without having any one there to warn persons
who might be passing along this street, there is no
dispute; this was conceded by the learned counsel for
the defendant on the trial, and while it is true that one
of the witnesses, who was one of the switching crew,
undertook to say that he had been around there just
before the train was moved, it was shown that he had
twice testified in the case before and had never made
any such claim before. His testimony on this point
cannot be held to have affected the clear and solemn ad-
mission of counsel that the company had no brakeman
or other person at the north end of those stationary
cars when confessedly they were moved back without
any signal. It is absolutely impossible for this court
to reconcile the testimony of the various witnesses,
but the conflict is no more marked between the witnes-
ses of the plaintiff and the defendant, than it is be-
tween the witnesses for the defendant itself. For ex-
ample, the witness William Pope, who testified to have
seen the accident, testified that he saw the little boy
run between the trucks of the second car; that he was
knocked down, and that he, witness, pulled him out,
but his statement is that the train was then backing
back when the boy was injured, whereas all the train
men concur in saying that they had coupled on to these
north three cars and were pulling them south when
they heard the cry that they were running over a boy.
Of course this testimony is directly contradictory to
that of the plaintiff and her witnesses, but it was for
the jury to weigh this evidence and credit or discredit
the various witnesses. The witness Moore for the de-
fendant testified that the north car did not touch the
boy at all, it was the north end of the south car, and
other witnesses for the defendant testified positively
that the train did not move after the boy was struck
and not until he had been removed to the hospital. And

yet all of the crew testify that they found blood on the top of the south wheel of the north car and on the track south of it, and this could not have been true unless this south wheel of the north car had run over the boy or over his blood on the track going north, and in this manner corroborated the plaintiff and her witnesses to the effect that the car did move after Mrs. Keating first took Mrs. Jaffi away from the scene. But as already said, these were all matters for the jury to weigh in reaching their conclusion as to how the little boy was hurt and which car struck him and which of the witnesses in their opinion correctly and truthfully detailed the occurrences which certainly resulted in the death of the little boy. We are not in a position to say that this case should not have been submitted to a jury on the ground that the testimony for the plaintiff was so radically opposed to the physical facts that it cannot be made the basis of a verdict.

II. Counsel challenges the instructions for the plaintiff. First it is said that instruction number one assumed the existence of facts stated and did not leave them to be found by the jury. This objection is not tenable. The instruction begins with the words, "If the jury believe from the evidence," and then proceeds to submit the facts which the jury must find before they can find for the plaintiff, and in reference to the running of the car said, "and that the running and management of its cars as aforesaid, if they were so run and managed," etc. And in this manner the facts were all submitted to the jury and not assumed.

The objection as to the length of the instruction, we think is without merit, for although the counsel for the defendant admitted that there was no one on the top of the rear car or near the end of it to warn pedestrians that the train was about to be moved backward suddenly, still one of the defendant's witnesses afterwards testified that he was near the end of the car. The

plaintiff had proved, and the burden was upon the plaintiff to prove the substantive facts alleged in her petition as the answer of the defendant put all those facts in issue, and moreover the defendant's own instruction number one required the jury to find the existence of the acts of negligence alleged in the petition. We have often ruled that it was improper to send the jury to the pleadings to find the issues to be submitted to them, and we think the instruction for the plaintiff therefore is not subject to this criticism.

The further objection to this instruction, that it was calculated to cause the jury to understand that it was the duty of the defendant to have some one in such a position as to see and warn persons who might be in positions of danger not merely at the north end of the stationary cars but those that might be between the cars or under the cars or elsewhere in places of danger, we think is clearly without merit. The plaintiff's instructions specifically called the attention of the jury to the failure to have a watchman or brakeman at the north end or upon the ground near such north end so as to see and warn persons and children, and the whole of the plaintiff's evidence tended to prove that it was the failure to have the watchman at the north end to warn the little boy, which the evidence showed was on the track north of the north end of said stationary cars. Standing alone, it could not possibly have mislead the jury as to the duty of the defendant. But the jury were not left in any doubt on this point, for in the third instruction given for the defendant, the court told the jury that the defendant had a right to move its cars back and forth over said tracks and State Line street, and was not required to keep any lookout for persons under or between its cars, and if deceased, Harry Jaffi, either went under the cars or attempted to pass through between them either while they were moving or standing still, without the knowledge of

the employees of the defendant, and the accident was caused by his going under the cars or attempting to pass between them, the plaintiff could not recover. And the court repeated this to the jury in the fifth instruction given for the plaintiff, wherein it told the jury the defendant "was not required to guard against persons under or between its cars."

III. Instructions three and four for the plaintiff are also assailed, but wherein they are incorrect is not pointed out by the learned counsel. Instruction number three submitted to the jury the question of contributory negligence of the mother in the usual and orthodox way, and number four submitted the question of the contributory negligence of the little boy himself. Certainly the defendant cannot complain that the court submitted the question of the little boy's contributory negligence to the jury as it was too favorable, if anything, to the defendant.

IV. Instruction number five for the plaintiff is also assigned as error. That instruction is as follows: "The court instructs the jury that the place where the accident happened was a public street, and that defendant did not have an exclusive right for the purpose of making up its trains or switching its cars, and that the public, including plaintiff's child, had the same right to use the highway as the defendant had, and that defendant's servants in the movement of its cars upon said street had no right to assume that the way was clear, but were bound to exercise ordinary care before moving such cars to ascertain and discover whether any person upon the street might be injured by such movement, but was not required to guard against persons under or between its cars." Counsel asserts that the plaintiff's son did not have the same right to use the street that the defendant had, that defendant had a right superior to that of the plaintiff's child or any

one else on its tracks. It is too plain for discussion that the little child of plaintiff was not a trespasser upon the public highway, but had an equal right to that of the defendant to the use of the street. [Jennings v. Railroad, 112 Mo. 268; Kennayde v. Railroad, 45 Mo. 255; Scullin v. Railroad, 184 Mo. 695; Rapp v. Railroad, 190 Mo. 161.]

V. Again, it is insisted that the judgment of the trial court should be reversed because of statements made by counsel for the plaintiff in his closing argument. As there is nothing in the bill of exceptions showing the alleged improper remarks of the counsel for the plaintiff, they are not before this court for review. This has been so uniformly ruled by this court that it is no longer open for discussion.

The instructions given for the defendant were all that the law would have justified and those for the plaintiff were such as have often received the approval of this court. The only question was one as to the evidence of how the boy came to receive his injuries and consequent death. As already said, there was a sharp conflict, indeed an irreconcilable conflict in the evidence, and the jury resolved that issue in favor of the plaintiff, and in our opinion there was no such state of evidence on behalf of the plaintiff as would authorize this court to say that it was opposed to all physical laws and was utterly unworthy of belief. As the case was properly submitted to the jury under correct instructions and the verdict was for the plaintiff, the judgment must be affirmed, and it is so ordered.

*Fox, P. J.,* and *Burgess, J.,* concur.